# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**JULIE D. SIPPEL**
            **Plaintiff,**

      **v.**                                          **Case No. 20-C-800**

**ANDREW M. SAUL,**
**Commissioner of the Social Security Administration**
            **Defendant.**

## DECISION AND ORDER

Plaintiff Julie Sippel seeks judicial review of the denial of her application for social security disability benefits. Plaintiff alleged that she could no longer work due to psoriatic arthritis and other impairments, but the Administrative Law Judge ("ALJ") assigned to the case concluded that she could still perform sedentary work. Plaintiff argues that the ALJ erred in discounting opinions from her treating rheumatologist and her primary doctor supporting greater limitations. As a remedy, she contends the court should give the rheumatologist's report controlling weight and find her disabled, rather than remanding the case for further proceedings. On review of the record and the submissions, I find that the ALJ erred in evaluating the doctors' opinions but that given the nature of the errors and the ambiguity in the evidence the usual remedy of remand for further proceedings is appropriate.

## I. FACTS AND BACKGROUND

### A.    Plaintiff's Application and Agency Decisions

Plaintiff applied for benefits in October 2016, alleging that she became disabled as of November 11, 2015 (Tr. at 165) due to psoriatic arthritis, type 2 diabetes, irritable bowel

syndrome, iron deficiency anemia, and asthma (Tr. at 193).[1]  She reported past employment as a manufacturing specialist from 1990 to 2015. (Tr. at 194.)  She indicated that this was an administrative position, primarily done seated and with little lifting required, although towards the end of her employment she did ask others to help with physical aspects of the job she could not handle.  (Tr. at 195.)  She reported that she was laid off on November 11, 2015 as part of a mass lay-off.  (Tr. at 193.)

In a function report, plaintiff wrote that she had trouble fastening jewelry and doing buttons.  (Tr. at 206.)  She was able to do some cleaning/laundry (Tr. at 207), drive a car, and shop in stores (Tr. at 208).  She reported that pain and swelling in her joints affected her ability to engage in a variety of physical activities, including lifting, squatting, bending, standing, reaching, walking, and sitting.  (Tr. at 210.)  In a physical activities addendum, plaintiff reported that she could continuously sit for one to two hours, stand for one hour, and walk 30 minutes to one hour; in a day, she could sit for two hours, stand one to two hours, and walk one to two hours.  Her doctor had limited her to lifting 10 pounds.  (Tr. at 213.)

Plaintiff supported her application with an October 5, 2016, arthritis medical assessment form completed by Dr. George Poullette, her primary physician.  Dr. Poullette indicated that plaintiff suffered from psoriatic arthritis, with objective signs of joint swelling, tenderness, muscle weakness, and chronic fatigue.  (Tr. at 222-23, 459-60.)  He indicated that her symptoms were severe enough to interfere with attention and concentration on a daily basis.  (Tr. at 223, 460.)  She could walk one to two blocks, continuously sit for two hours after which she had to walk or stand, and continuously stand for 30 minutes before she had to walk or lie

_____

[1]Plaintiff later experienced a stroke and underwent coronary artery bypass surgery.  In an appendix to this decision, I summarize the pertinent medical evidence.

down. In an eight-hour workday, she could stand less than two hours and sit about two hours. She required eight unscheduled breaks of 10 minutes duration during the workday. (Tr. at 224, 461.) She could occasionally lift 10 pounds, rarely lift 20 pounds, never more. She could rarely twist or stoop, and could use her hands for grasping, her fingers for fine manipulation, and her arms for reaching 50% of the day. Finally, Dr. Poullette estimated plaintiff would be absent from work about four days per month as a result of her impairments or treatment. (Tr. at 225, 462.)

Dr. Poullette also prepared a letter dated November 17, 2016, in which he indicated plaintiff had been under his care for many years and suffered from a number of medical problems including psoriatic arthritis, insulin dependent diabetes, asthma, and irritable bowel syndrome. He indicated psoriatic arthritis was the primary source of her disability,[2] causing chronic inflammation, pain, limited range of motion, and weakness, with her symptoms becoming progressive despite treatment. She was not able to do any physical labor lifting more than 10 pounds; chronic repetitive movements aggravated arthropathy in her arms, hands, and fingers; and she was restricted from bending and lifting due to back pain. He indicated that she should avoid standing, sitting, or walking more than two hours consecutively or more than six hours per day total. She also had difficulty gripping. He concluded: "Due to her multiple chronic and progressive medical problems, [plaintiff] is not able to work in a competitive environment. She has significant restrictions on her ability to work as outlined above. I support her disability claim." (Tr. at 220, 476.)

Plaintiff also obtained an arthritis medical assessment form, dated March 15, 2017, from

---

[2]In his treatment notes, Dr. Poullette indicated that plaintiff was "followed by rheumatology" for her psoriatic arthritis. (Tr. at 523, 562.)

Dr. Manpreet Sethi, her treating rheumatologist. (Tr. at 612.) Dr. Sethi listed a diagnosis of psoriatic arthritis, causing frequent pain in the back, ankles, and right knee. (Tr. at 609.) Dr. Sethi identified objective signs of joint deformity, impaired sleep, tenderness, weight change, and chronic fatigue. She indicated that plaintiff's symptoms would seldom interfere with attention and concentration. She opined that plaintiff could walk one to two blocks, sit for about two hours before she had to walk or stand, and stand for 30 minutes before she had to walk or lie down. In an eight-hour workday, plaintiff could stand less than two hours and sit about two hours. She required eight unscheduled breaks of 15 minutes duration based on chronic fatigue and pain/paresthesias. (Tr. at 611.) She could occasionally lift 10 pounds, never more, and rarely twist or stoop. She could use her hands for grasping and her fingers for fine manipulation 10% of the day, and her arms for reaching 50% of the day. Finally, plaintiff's impairments would produce good and bad days, and more than four work absences per month. (Tr. at 612.) Plaintiff also provided the agency with documentation of her work absences during her last two years of employment. (Tr. at 226-29.)

The agency denied the application initially on January 11, 2017 (Tr. at 69, 97), based on the review of Mina Khorshidi, M.D., who concluded that plaintiff could perform sedentary work (Tr. at 76-77). Plaintiff requested reconsideration (Tr. at 101), but on October 16, 2017 (Tr. at 80, 102), the agency maintained the denial based on the review of Pat Chan, M.D., who determined that plaintiff could perform light work with occasional stooping (Tr. at 91-92). Plaintiff then requested a hearing before an ALJ. (Tr. at 109.)

Prior to the hearing, plaintiff presented an update from Dr. Sethi, dated January 24, 2019, in which Dr. Sethi indicated that since her previous report plaintiff had a stroke and

4

underwent heart surgery,[3] "increasing functional limitations, fatigue, weakness, dizziness." Her "psoriatric arthritis seems to be stable." (Tr. at 1388.)

## B.    Hearing

On February 13, 2019, plaintiff appeared with counsel before the ALJ. The ALJ also summoned a vocational expert ("VE") to provide testimony on jobs plaintiff might be able to do. (Tr. at 31.)

At the outset of the hearing, plaintiff amended the onset date to February 8, 2016. (Tr. at 36-37, 325.) In an opening statement, counsel indicated that when plaintiff was employed she missed quite a bit of work due to arthritis flares, using vacation and FMLA days. (Tr. at 38.) Counsel acknowledged that plaintiff also missed some days assisting her mother but indicated that she was having difficulty on the job before she was laid off; other people helped her, particularly with the portions of the job requiring mobility. (Tr. at 38.) After she stopped working, plaintiff experienced additional medical problems, including coronary artery disease and bypass surgery, as well as a stroke. (Tr. at 38-39.) "But primarily what caused her to stop working when she did were the conditions related to the psoriatic arthritis. And both Dr. [Poullette], who was their primary doctor, and Dr. Sethi, the rheumatologist, indicated functional limitations that essentially limit her to part-time sedentary work with some limited use of the hands for grasping, fine manipulation and reaching." (Tr. at 39.)

Plaintiff testified that she last worked in November 2015 as a manufacturing specialist at a manufacturing company. (Tr. at 41, 42.) She worked there for 25 years before being laid off, along with 30 other people. (Tr. at 42.) This was a sit-down job, primarily handling

_____

[3]Plaintiff experienced the stroke in May 2017 (Tr. at 662) and underwent coronary artery bypass graft surgery in May 2018 (Tr. at 1305.)

5

paperwork. (Tr. at 43.)

Plaintiff testified that she lived with her mother, who has Alzheimer's, and her 27-year-old daughter. (Tr. at 43, 45.) She assisted her mother with self-care, cooking, and driving her to appointments. (Tr. at 43-45.) She had been caring for her mother for at least 10 years. (Tr. at 44.) Plaintiff testified that she was diagnosed with psoriatic arthritis more than 20 years ago and had been treated with medications, starting with methotrexate, changing to Enbrel in the last five years. (Tr. at 45-46.)

The VE classified plaintiff's past job as an "administrative clerk" under the Dictionary of Occupational Titles ("DOT"), a semi-skilled job, light per the DOT, sedentary as performed. (Tr. at 50.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and experience, limited to light work with occasional stooping. (Tr. at 51.) The VE testified that such a person could do plaintiff's past work, generally and as performed, as well as other jobs including office helper, small products assembler, and electrical assembler. (Tr. at 51-52.) Adding a limitation of frequent handling and fingering bilaterally did not change the answer. (Tr. at 52.) If the person were limited to sedentary work with occasional stooping, the person could work as an administrative clerk, as performed, but not generally. (Tr. at 52-53.) The person could also do other unskilled jobs such as information clerk, addressing clerk, and document preparer. (Tr. at 53.) Adding a limitation of frequent handling and fingering, the person could still do the administrative clerk job, as performed (Tr. at 54), as well as the other sedentary jobs (Tr. at 55).

The ALJ then asked if there were any transferrable skills from plaintiff's past work to other sedentary jobs, and the VE identified administrative skills of data entry and use of office equipment. (Tr. at 55.) The VE testified that these skills would transfer to other jobs including

6

civil service clerk, receptionist, and order clerk. (Tr. at 55-56.)

The VE testified that employers usually permit one absence per month and two 15-minute breaks per day in addition to a 30-minute lunch period. (Tr. at 57.) Exceeding these allowances would preclude competitive work. (Tr. at 57.)

In a post-hearing affidavit, plaintiff clarified the activities set forth in her function report. She indicated that while she did some cleaning, she could maintain that level of activity for about 30 minutes before fatiguing and experiencing increased pain levels. Her daughter did the more strenuous chores such as vacuuming, mopping, and scrubbing the floors. Plaintiff further clarified that she shopped about once per month, using a shopping cart to take pressure off her back and hips; her daughter did most of the shopping. (Tr. at 382.) Plaintiff averred that she continued to have difficulties using her hands, e.g., opening cans or jugs. She explained that she tried to complete some chores in the morning, e.g., cleaning, cooking, or assisting her mother, before she fatigued. She was able to walk her dog about one block. She typically spent afternoons resting. (Tr. at 383.) For pain, she used Tramadol, which adversely affected her ability to concentrate and focus. Plaintiff also clarified the assistance she provided her mother, who remained able bodied and capable of managing her daily activities, explaining that the assistance consisted mainly of prompting her mother. Finally, plaintiff indicated that she suffered a stroke in late 2016, with some residual symptoms, e.g., right-sided weakness.[4] (Tr. at 384.)

## C.     ALJ's Decision

On June 3, 2019, the ALJ issued an unfavorable decision. (Tr. at 10.) Following the

---

[4]As indicated in note 3, supra, the stroke occurred in May 2017. (Tr. at 672-73.)

familiar five-step evaluation process, see 20 C.F.R. 404.1520(a)(4), the ALJ determined (1) that plaintiff had not engaged in substantial gainful activity since November 11, 2015, the alleged onset date (Tr. at 15);[5] (2) that she suffered from the severe impairments of psoriatic arthritis and coronary artery disease (Tr. at 15);[6] (3) that neither of those impairments qualified as conclusively disabling under the agency's Listings (Tr. at 16); (4) that she retained the residual functional capacity ("RFC") to perform sedentary work (Tr. at 17), consistent with her past employment as an administrative clerk (Tr. at 21); and (5), alternatively, that she had acquired work skills from her past employment transferrable to other occupations existing in significant numbers in the national economy, as identified by the VE (Tr. at 21-22).

In determining RFC, the ALJ considered plaintiff's claimed symptoms and limitations, finding her statements not entirely consistent with the medical and other evidence of record. (Tr. at 17.) Regarding her psoriatic arthritis, plaintiff alleged difficulty buttoning and fastening objects, chronic fatigue limiting her to 30 minutes of exertion before rest, and generalized joint pain, but the ALJ found that the records were only partially consistent with these claims. (Tr. at 17.) While examinations showed trigger finger symptoms, tenderness in the bilateral sacroiliac joints, and muscle spasms throughout the back, the record did not document chronic synovitis in the joints, and plaintiff's joint strength levels had been relatively intact and stable. (Tr. at 17.) The ALJ also found plaintiff's ability to drive somewhat inconsistent with her alleged struggles to use her hands and fingers to control and handle objects. (Tr. at 17.) The ALJ

---

[5]The ALJ overlooked plaintiff's amendment of the onset date to February 8, 2016. Plaintiff notes the error but does not claim she was prejudiced by it. (Pl.'s Br. at 2.)

[6]The ALJ found plaintiff's diabetes, irritable bowel syndrome, stroke, and other alleged impairments non-severe. (Tr. at 15-16.) Plaintiff does not challenge that finding.

found further inconsistency in plaintiff's ability to work for 20+ years all while claiming to experience many of the same psoriatic arthritis symptoms she now said rendered her disabled. (Tr. at 17.) Plaintiff admitted that she stopped working because she was terminated as part of a general lay-off, along with about 30 other employees, rather than due to a medical reason. (Tr. at 17-18.) "Notably, there has been no intervening event or other showing that her arthritic symptoms have significantly worsened since she stopped working. . . . To now claim those symptoms prevent her from working is inconsistent with the aforementioned work history." (Tr. at 18.) That said, the ALJ accepted the signs of chronic sacroiliac joint pain and muscle spasms in the low back as supportive of significant limitation in exertional tolerance, especially when considered in conjunction with plaintiff's coronary artery disease. The ALJ accordingly limited plaintiff to sedentary work due to her chronic joint pain and fatigue caused by psoriatic arthritis. (Tr. at 18.)

The record generally indicated that plaintiff experienced some heightened fatigue after her May 2018 heart bypass surgery, in part because she had to change some of her arthritis medications thereafter. However, the ALJ found that this heightened fatigue was not objectively documented to have lasted for 12 months after the surgery. There was no indication plaintiff had to elevate her feet because of residual cardiovascular concerns, and she had not shown signs of significant swelling in the lower extremities. The ALJ thus found a restriction to sedentary work reasonably accounted for plaintiff's serious arterial occlusion in May 2018 but with no significant cardiovascular symptoms since the bypass surgery. (Tr. at 18.)

As for the opinion evidence, the ALJ gave great weight to Dr. Khorshidi's finding that plaintiff could perform sedentary work, finding that opinion supported by a reasoned discussion

of the evidence available at the time.  The ALJ further found the restriction to sedentary work reasonably consistent with the signs and findings of sacroiliac joint pain, muscle spasms in the back, and trigger finger complications, all of which suggested significant limitation in plaintiff's ability to lift, carry, and tolerate weight bearing activity.  (Tr. at 18.)

The ALJ gave only some weight to Dr. Chan's opinion that plaintiff could perform light work with occasional stooping.  Dr. Chan did not have the opportunity to consider the complications of coronary artery disease that arose in May 2018, and the ALJ found greater limitation warranted when considering how shortness of breath and chest pain might affect plaintiff if asked to perform at the light level on a sustained basis.  (Tr. at 18.)  The ALJ did accept Dr. Chan's limitation to occasional stooping, finding it reasonably consistent with the signs of muscle spasms and sacroiliac joint pain, further noting that occasional stooping is inherent in the definition of sedentary work.  (Tr. at 18-19.)

The ALJ next considered the opinion of treating physician Dr. Poullette, who stated that plaintiff could sit for two hours in a typical workday, walk and stand for 30 minutes at a time before needing to lie down, would need eight unscheduled breaks in a workday lasting 10 minutes each, could lift and carry at the sedentary level, could rarely twist and stoop, could use the hands, fingers and arms only 50% of the time, and would be absent from work about four days per month.  (Tr. at 19.)  For several reasons, the ALJ gave this opinion little weight.  First, Dr. Poullette noted that psoriatic arthritis was the main limiter, but he did not treat plaintiff for this impairment.  Second, Dr. Poullette did not cite evidence or support for the alleged need to lie down, nor did his opinion or the evidence suggest a basis for the off-task and unscheduled break limits.  Third, Dr. Poullette's limitations in use of the hands and fingers was inconsistent with the clinical findings that generally found tenderness in the hands but no

significant synovitis, the treating rheumatologist's determination that her psoriatic arthritis symptoms were stable, plaintiff's reported driving, and the clinical signs of retained strength in the hands and upper extremities. (Tr. at 19.) Overall, the ALJ found Dr. Poullette's opinion "not fully consistent with the medical evidence." (Tr. at 19.)

The ALJ also gave little weight to the opinions of treating physician Dr. Sethi, who gave an opinion very similar to that of Dr. Poullete, stating in relevant part that plaintiff was unable to sustain a seated, standing or walking position for a total of eight hours, required eight unscheduled breaks during a typical workday, and would be absent from work four times per month. (Tr. at 19.) The ALJ found that the "objective record simply does not reflect signs of such serious pain as to support these extreme restrictions." (Tr. at 19.) The ALJ found Dr. Sethi's opinion generally inconsistent with the signs of only mild tenderness in the fingers and no significant synovitis in the same. Plaintiff did not appear to be bedridden or unable to navigate her surroundings independently. The ALJ found that Dr. Sethi's opinions were also inconsistent with the treatment records showing plaintiff to have recovered from bypass surgery within a few months. "They are also inconsistent with the work history showing she worked with . . . many of her symptoms for many years until she was let go for reasons unrelated to her medical condition." (Tr. at 19.)

In sum, the ALJ found the RFC supported by the objective evidence of record, rather than plaintiff's subjective complaints. The ALJ found plaintiff's subjective allegations largely inconsistent with what the objective evidence suggested in terms of functional restriction. While the evidence did support the existence of severe impairments, it did not support the specifics of her allegations concerning the severity and frequency of the related symptoms. Ultimately, the ALJ found that the evidence of record did not support greater restrictions than

detailed in the RFC. (Tr. at 19.)

On April 3, 2020, the Appeals Council denied review (Tr. at 1), making the ALJ's decision the final word from the Commissioner for purposes of judicial review. See Jozefyk v. Berryhill, 923 F.3d 492, 496 (7th Cir. 2019). This action followed.

## II. DISCUSSION

### A. Standard of Review

The court will uphold an ALJ's decision if it uses the correct legal standards, is supported by substantial evidence, and builds an accurate and logical bridge from the evidence to the conclusion. Jeske v. Saul, 955 F.3d 583, 587 (7th Cir. 2020). "Substantial evidence" means "evidence a reasonable mind might accept as adequate to support a conclusion." Lothridge v. Saul, 984 F.3d 1227, 1232 (7th Cir. 2021). In determining whether the decision is adequately supported, the court reviews the entire record but will not replace the ALJ's judgment with its own by reconsidering facts, re-weighing or resolving conflicts in the evidence, or deciding questions of credibility. Jeske, 955 F.3d at 587. In building the necessary bridge, the ALJ need not discuss every piece of evidence in the record, but he must sufficiently articulate his assessment of the evidence to assure the court that he considered the important evidence and to enable the court to trace the path of his reasoning. Rohan v. Chater, 98 F.3d 966, 971 (7th Cir. 1996).

### B. Plaintiff's Arguments

#### 1. Dr. Sethi's Opinions

Plaintiff argues that the ALJ erred in evaluating the opinions of Dr. Sethi, her treating rheumatologist. (Pl.'s Br. at 10.) For claims such as this one, filed prior to March 2017, a

treating source's opinion is entitled to "controlling weight" if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); see also Reinaas v. Saul, 953 F.3d 461, 465 (7th Cir. 2020). If the opinion does not qualify for controlling weight, the ALJ must decide how much value it does have under the factors set forth in § 404.1527(c), including "the treatment relationship's length, nature, and extent; the opinion's supporting explanation and consistency with other evidence; and any specialty of the physician." Lambert v. Berryhill, 896 F.3d 768, 775 (7th Cir. 2018). The ALJ must give "good reasons" for the weight afforded a treating source's medical opinion. 20 C.F.R. § 404.1527(c)(2); see also Larson v. Astrue, 615 F.3d 744, 749 (7th Cir. 2010).

Plaintiff first argues that the ALJ erred by failing to discuss Dr. Sethi's speciality as a rheumatologist and the length/frequency of their treatment relationship, as required by § 404.1527(c). (Pl.'s Br. at 10-11.) The Commissioner responds that an ALJ need not explicitly discuss and weigh each regulatory factor. (Def.'s Br. at 5, 18, citing Collins v. Berryhill, 743 Fed. Appx. 21, 25 (7th Cir. 2018); Henke v. Astrue, 498 Fed. Appx. 636, 640 n.3 (7th Cir. 2012).) In reply, plaintiff criticizes the Commissioner for relying on unpublished decisions (Pl.'s Rep. Br. at 1-2), but she then acknowledges the Seventh Circuit's apparent rejection of the "extreme" view that an ALJ's failure to discuss each and every factor in § 404.1527 always constitutes reversible error. (Pl.'s Rep. Br. at 2, citing Stocks v. Saul, No. 19-3298, 2021 U.S. App. LEXIS 2799, at *10 (7th Cir. Feb. 2, 2021); Elder v. Astrue, 529 F.3d 408, 412 (7th Cir. 2008).) If the ALJ's decision, read as a whole, shows that the ALJ implicitly considered the relevant factors, or if the record contains no specific evidence pertaining to a certain factor, the absence of explicit findings would be, at most, harmless error. See Jeske, 955 F.3d at 596 (adopting this

13

approach to ALJ discussion of RFC functions); see also Karr v. Saul, 989 F.3d 508, 512 (7th Cir. 2021) (finding failure to march through each of the factors in § 404.1527(c)(2) harmless in that case).

As plaintiff notes, the ALJ failed to mention Dr. Sethi's status as a rheumatologist, the relevant specialty in a psoriatic arthritis case. See, e.g., Barg v. Astrue, No. 1:08-CV-1173 (NAM/VEB), 2012 U.S. Dist. LEXIS 190381, at *36-37 (N.D.N.Y. Mar. 21, 2012). The ALJ also failed to specifically discuss the nature and extent of the treatment relationship, which commenced in October 2015 and continued through the time of the hearing, including (by my count) nine visits during that span. (Tr. at 524, 534, 544, 555, 566, 621, 814, 1168, 1192.) It is hard to dismiss this oversight as harmless, since the ALJ discounted Dr. Poullette's opinion in part because he did not specifically treat plaintiff for psoriatic arthritis. (Tr. at 19.) Dr. Sethi did, yet the ALJ failed to consider whether and how this relationship and the doctor's speciality affected his analysis.

Plaintiff further argues that the ALJ failed to provide "good reasons" for discounting Dr. Sethi's opinion. As indicated above, the ALJ provided four grounds for his conclusion: (1) Dr. Sethi's opinion was inconsistent with the objective medical evidence, including signs of only mild tenderness in the fingers and no significant synovitis; (2) plaintiff did not appear to be bedridden or unable to navigate her surroundings independently; (3) the treatment records indicated plaintiff recovered from her bypass surgery within a few months; and (4) plaintiff's employment record showed that she worked with psoriatic arthritis for many years until she was laid off for unrelated reasons. (Tr. at 19.)

Plaintiff contends that the ALJ placed too much weight on the absence of synovitis (inflammation/swelling), which, according to an article attached to her brief, occurs in only a

14

sub-set of psoriatic arthritis cases.  (Pl.'s Br. at 12.)  The argument is difficult to follow.  The article states that "dactylitis" (inflammation/swelling of the digits) is "one of the cardinal features of psoriatic arthritis" (R. 16-1 at 1) and "occurs commonly among patients with psoriatic arthritis" (R. 161-1 at 3).  Courts have likewise noted that inflammation and swelling are symptoms commonly associated with arthritis, the absence or presence of which an ALJ may find significant in evaluating a disability claim based on that condition.  See Tina W. v. Saul, No. 19 CV 50244, 2021 U.S. Dist. LEXIS 26393, at *21-22 (N.D. Ill. Feb. 10, 2021) (rejecting claimant's argument that the ALJ erred by citing the absence of synovitis in a rheumatoid arthritis case); White v. United States Comm'r, No. 6:15-cv-01492, 2016 U.S. Dist. LEXIS 54458, at *21 (W.D. La. Apr. 22, 2016) ("Frequent findings of synovitis are found in the record. Such findings are consistent with the claimant's psoriatic arthritis diagnosis."); Camba v. Colvin, No. CV 13-09482-DFM, 2014 U.S. Dist. LEXIS 94851, at *8 n.2 (C.D. Cal. July 10, 2014) (finding treating rheumatogist's opinion supported by the presence of joint inflammation and dactylitis, and noting: "Dactylitis, or 'sausage digits,' refers to swelling of an entire finger or toe and is a distinguishing indicator of psoriatic arthritis."); Hammond v. Astrue, Civ. No. 11-2536 (PAM/FLN), 2012 U.S. Dist. LEXIS 154188, at *47 (D. Minn. Sept. 28, 2012) (finding that substantial evidence, including absence of synovitis, supported rejection of treating source report in psoriatic arthritis case), adopted, 2012 U.S. Dist. LEXIS 153358 (D. Minn. Oct. 25, 2012).

While plaintiff criticizes the "ALJ's invented connection between synovitis and severe psoriatic arthritis" (Pl.'s Rep. Br. at 6), I see nothing improper in his observation; that some psoriatic arthritis sufferers may not experience this symptom does not mean it was wrong for

the ALJ to note its absence here.[7]  Moreover, it is the ALJ's job to weigh and determine the significance of the evidence, subject to deferential review by the court.  See, e.g., L.D.R. v. Berryhill, 920 F.3d 1146, 1152 (7th Cir. 2019); Denton v. Astrue, 596 F.3d 419, 426 (7th Cir. 2010); see also Schmidt v. Astrue, 496 F.3d 833, 842-43 (7th Cir. 2007) (affirming ALJ's rejection of source's medical opinion because it was inconsistent with the source's treatment notes).

Plaintiff next argues that the ALJ misrepresented the record in stating Dr. Sethi found only "mild" tenderness in her hands.  (Pl.'s Br. at 12.)  Careful review of the treatment notes reveals that while Dr. Sethi referred to mild tenderness of the SI joints (Tr. at 528, 548), she did not specifically mention mild tenderness of the finger/hand joints.  In several notes, Dr. Sethi stated "no significant synovitis present in MCPs, PIPs or DIPs but there is tenderness in these areas."[8]  (Tr. at 570, 625, 818, 1172, 1197.)  The Commissioner cites a February 6, 2016 note (Def.'s Br. at 13), in which Dr. Sethi stated: "Dactylitis present on the right third and left second digit? Mild. Tenderness present on multiple PIP joints."  (Tr. at 548.)  Later in this note, Dr. Sethi noted mild tenderness on palpation of the SI joints.  (Tr. at 548.)  And in a July 1, 2016 note, Dr. Sethi stated: "Very mild dactylitis present on bilateral second and third fingers[.]"  (Tr. at 559.)  Nevertheless, plaintiff is correct: Dr. Sethi never specifically found mild tenderness

---

[7]Plaintiff assumes that Dr. Sethi knows synovitis is present in only some cases, as discussed in the article (Pl.'s Br. at 12), but she presents no evidence in support of this contention.  I agree that there is nothing wrong with submitting scholarly articles (see Pl.'s Rep. Br. at 6), but such publications cannot substitute for specific evidence about the claimant's condition (as will be discussed further below).

[8]"MCP" ("MetaCarpoPhalangeal"), "PIP" ("Proximal InterPhalangeal"), and "DIP" ("Distal InterPhalangeal") are the three joints in a person's fingers/hands. https://en.wikipedia.org/wiki/Interphalangeal_joints_of_the_hand (last visited April 16, 2021).

of the fingers/hands, contrary to the ALJ's statement.

Plaintiff next challenges the ALJ's reliance on her work history, arguing that a claimant's "dogged efforts" to continue working should not be held against her, see Pierce v. Colvin, 739 F.3d 1046, 1051 (7th Cir. 2014), and that the ALJ cited no evidence in support of his contention that her condition did not worsen during the relevant time period. (Pl.'s Br. at 13.) Plaintiff notes that in November 2015 Drs. Poullette and Sethi both indicated that she was not a candidate for disability, with Dr. Poullete stating: "I think she could continue to work in the right work setting." (Tr. at 544.) However, on February 6, 2016, the amended onset date, Dr. Sethi noted a flare-up with tenderness in the PIP joints. (Tr. at 544, 548.) Plaintiff further notes that by July 2016 her "RAPID3" ("Routine Assessment of Patient Index Data 3") score increased from moderate to severe. (Pl.'s Br. at 13-14.) In October 2016, Dr. Poullette opined that she could not sustain full-time work, and Dr. Sethi followed suit in March 2017. (Pl.'s Br. at 14.) Plaintiff also contends that psoriatic arthritis is a progressive disease, yet the ALJ failed to explain why he did not believe that to be the case here. (Pl.'s Br. at 14.) Nor did the ALJ grapple with the evidence that she frequently missed work prior to being laid off. (Pl.'s Br. at 14-15; Pl.'s Rep. Br. at 10.)

The Commissioner responds that, contrary to plaintiff's suggestion, the record does not demonstrate worsening of her condition after she was laid off. (Def.'s Br. at 15-16.) In October 2015, plaintiff reported flare-ups every one to two months, lasting one or two days. (Tr. at 524.) In February 2016, she reported experiencing a flare at that time, but she further noted that when not going through a flare-up "she is otherwise doing okay." (Tr. at 544.) She again stated that her flares usually lasted one to two days, then resolved on their own. (Tr. at 544.) Plaintiff relies on the subsequent increase in her RAPID3 scores, but such scores are based

on the patient's self-assessment rather than objective findings.[9]  Most of Dr. Sethi's post-onset

treatment notes reflect the exact same findings, with no clear indication of progression.  (Tr.

at 625, 818, 1172, 1197).[10]  The Commissioner also notes that Dr. Poullette's treatment note

from October 4, 2016—the day before he prepared his report—documented a generally normal

physical exam, with no indication as to what had changed over the previous  year causing him

to now consider plaintiff disabled.  (Def.'s Br. at 16; Tr. at 564.)

Resolution of this dispute is beyond the scope of judicial review.  The ALJ stated that

"there has been no intervening event or other showing that [plaintiff's] arthritic symptoms have

significantly worsened since she stopped working," but he not specifically discuss the evidence

set forth above, and the court's review is limited to the reasons he provided.  See Jelinek v.

Astrue, 662 F.3d 805, 811 (7th Cir. 2011) (citing SEC v. Chenery, 318 U.S. 80, 93-94 (1943)).

The ALJ also failed to discuss the evidence that plaintiff frequently missed work prior to being

---

[9]https://www.ra.com/rheumatoid-arthritis-resources/rapid3-survey (last visited April 22, 2021).  In reply, plaintiff criticizes the ALJ for ignoring the RAPID3 scores (Pl.'s Rep. Br. at 11), but an ALJ need not "discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability."  Jones v. Astrue, 623 F.3d 1155, 1162 (7th Cir. 2010).  It is hard to see how such scores constitute a "line of evidence" the ALJ must consider in every case.  See Lindee R. v. Saul, No: 1:18-CV-3095-FVS, 2019 U.S. Dist. LEXIS 227893, at *23-24 (E.D. Wash. Nov. 12, 2019) (finding ALJ permissibly relied on objective examinations and imaging, rather than RAPID3 score and other more subjective findings, in evaluating a medical opinion).  Cf. Denton, 596 F.3d at 425 (holding that ALJ did not err by refusing to consider GAF scores in mental impairment case).  Nevertheless, because the matter must be remanded, plaintiff may bring these scores to the ALJ's attention on remand.

[10]In these notes, from February 2017 (the month before Dr. Sethi prepared her initial report), August 2017, November 2017, and June 2018, Dr. Sethi found "no significant synovitis present in MCPs, PIPs or DIPs but there is tenderness in these areas.  No significant synovitis in elbows and shoulders.  [B]ilateral SI joints are tender.  Normal range of motion of bilateral ankles and feet.  No significant effusion in bilateral knees.  Bilateral hips have normal range of motion."  On November 18, 2017, Dr. Sethi wrote: "Nothing has gotten better or worse since [her] last visit."  (Tr. at 1168.)

laid off.  (Pl.'s Rep. Br. at 10.)

Finally, plaintiff argues that the ALJ's observations that she was not bedridden and that she recovered from her bypass surgery are non sequiturs.  Dr. Sethi's March 2017 opinion does not contain limitations related to plaintiff's heart condition, which manifested over a year later, and neither Dr. Sethi nor Dr. Poullette claimed plaintiff was bedridden but rather that she could not handle full-time work.  (Pl.'s Br. at 15.)  The Commissioner does not specifically defend these reasons, as plaintiff notes in reply.[11]  (Pl.'s Rep. Br. at 5.)

In sum, the ALJ failed to discuss important regulatory factors in this case, and at least some of the reasons he provided for discounting Dr. Sethi's opinion do not withstand scrutiny. Accordingly, I cannot uphold his decision giving this opinion little weight.  I turn next to plaintiff's claim that I should deem Dr. Sethi's opinion entitled to controlling weight and thus award benefits, rather than remanding for further proceedings.

## B.    Remedy

"When a reviewing court remands to the Appeals Council, the ordinary remedy is a new hearing before an administrative law judge.  In unusual cases, however, where the relevant factual issues have been resolved and the record requires a finding of disability, a court may order an award of benefits."  Kaminski v. Berryhill, 894 F.3d 870, 875 (7th Cir. 2018).

Plaintiff argues for a judicial award here.  (Pl.'s Br. at 16.)  Because that "remedy is a marked departure from [the] typical practice of remanding to the agency for further

_____

[11]While the doctors did not say plaintiff was bedridden, they did suggest a need to lie down during the day.  (Tr. at 224, 611.)  And, Dr. Sethi's January 2019 update did reference plaintiff's heart surgery, suggesting that it contributed to plaintiff's increased fatigue.  (Tr. at 1388.)  It was thus reasonable for the ALJ to note plaintiff's recovery after that procedure, particularly as it related to her claims of fatigue.  (See Tr. at 18.)

proceedings," Martin v. Saul, 950 F.3d 369, 376 (7th Cir. 2020), because of the nature of the errors identified above, see Sapp v. Saul, No. 1:19-cv-00121-JD, 2020 U.S. Dist. LEXIS 37771, at *19 (N.D. Ind. Mar.4, 2020 ("[I]f the agency has not considered all relevant factors . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."), and because the record does not compel a disability finding, I decline to order benefits and instead remand for further proceedings. See Briscoe v. Barnhart, 425 F.3d 345, 355 (7th Cir. 2005) ("An award of benefits is appropriate only where all factual issues have been resolved and the record can yield but one supportable conclusion.") (internal quote marks omitted).

Plaintiff relies on Kaminski, where the court held: "Once the treating physician's opinions are given the proper weight, the record compels the conclusion that Kaminski was unable to work and thus was disabled under the relevant statutes and regulations." 894 F.3d at 876. Plaintiff argues that Dr. Sethi's opinion is entitled to controlling weight in this case, further noting that, according to the VE, employers will not tolerate the absences and extra breaks Dr. Sethi anticipated. (Pl.'s Br. at 19; Tr. 57.)

While the ALJ erred in his evaluation of Dr. Sethi's opinions, as discussed above, the record does contain significant contrary evidence, including examinations showing no or limited swelling of the joints (Tr. at 548, 559, 570, 575, 621, 625, 814, 1172, 1192), normal range of motion (Tr. at 548, 559, 570, 575, 625, 1172, 1217), full or nearly full strength (Tr. at 570, 818, 1172), and positive response to medication (Tr. at 555, 621, 814).[12] The record also contains

_____

[12]In reply, plaintiff alleges a Chenery violation in the Commissioner's citation of evidence the ALJ did not mention. (Pl.'s Rep. Br. at 11-12.) To the extent this evidence is cited on the issue of remedy, there is no violation. When the claimant seeks a judicial award, the court determines whether the record as a whole compels that result; the court is not at that point

the reports of two reviewing physicians who found plaintiff capable of sedentary and light work. See Ketelboeter v. Astrue, 550 F.3d 620, 625 (7th Cir. 2008) ("[I]f the treating physician's opinion is inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints, the ALJ may discount it."). This case is like Israel v. Colvin, 840 F.3d 432, 441 (7th Cir. 2016), where the court, in affirming the denial of a judicial award, stated:

> Israel has presented substantial evidence which can be read in favor of an award of benefits, but the record also includes some evidence that could be read to undermine his claim, including the opinions of two non-treating internists . . . and physical examination findings over the years that present an unclear picture of the effectiveness of various treatments for his persistent pain.

Plaintiff's specific arguments in favor of a judicial award are unpersuasive. Plaintiff first contends that nothing in the record meaningfully contradicts Dr. Sethi's opinion regarding her need for breaks due to the fatigue caused by her psoriatic arthritis and the medications she takes. She notes that she repeatedly complained of severe fatigue, a common symptom of psoriatic arthritis, often causing workplace disability. (Pl.'s Br. at 17.)

The problem with this argument is that the ALJ found plaintiff's statements not entirely consistent with the record, including the objective medical evidence, her daily activities, and her work history,[13] a finding plaintiff does not specifically challenge.[14] Moreover, the Seventh

---

limited to the evidence cited by the ALJ. See Uphill v. Barnhart, 271 F. Supp. 2d 1086, 1094 n.7 (E.D. Wis. 2003) ("In determining whether to award benefits rather than remand the matter, I must consider whether the entire record compels such a result. This obviously may include evidence unmentioned by the ALJ.").

[13]The ALJ did not entirely discount plaintiff's complaints, crediting them to the extent they suggested a limitation to sedentary work.

[14]I acknowledge that some of the reasons the ALJ gave for discounting Dr. Sethi's opinion overlap with the grounds for his credibility determination.

Circuit has rejected the notion that any symptom associated with an impairment is automatically imputed to a claimant who suffers from that condition. See Schmidt v. Barnhart, 395 F.3d 737, 746 (7th Cir. 2005) ("Even assuming the accuracy of Schmidt's unsupported contention that some persons with IBS may experience fatigue, this does not mean that Schmidt suffers this symptom; the ALJ was correct in noting that there is no objective support in the medical records for Schmidt's contention that he suffers from IBS-related fatigue."); see also Kenealy v. Saul, No. 19-cv-40-jdp, 2019 U.S. Dist. LEXIS 206866, at *14 (W.D. Wis. Dec. 2, 2019) ("[S]he cites online medical information stating that fatigue is a common symptom of multiple sclerosis, which says nothing about Kenealy's own experience of fatigue.").

In reply, plaintiff notes that Schmidt and Kenealy addressed credibility issues, not a treating source report (Pl.'s Rep. Br. at 7), but it was plaintiff who highlighted her statements regarding fatigue in her main brief, and it is not unusual for the analysis of a doctor's report and a claimant's statements to overlap (as it did in this case). Indeed, plaintiff goes on to argue that in her case she does not rely solely on the articles as evidence of fatigue, as the record documents her complaints of fatigue. (Pl.'s Rep. Br. at 7.) Of course, the ALJ was not required to accept those complaints or the doctors' reports to the extent there were based thereon. See Karr v. Saul, 989 F.3d 508, 512 (7th Cir. 2021) ("[A]n ALJ does not owe any deference to the portion of a treating physician's opinion based solely on the claimant's subjective complaints."); Stepp v. Colvin, 795 F.3d 711, 720 (7th Cir. 2015) ("We have also established that an ALJ is free to discount the applicant's testimony on the basis of the other evidence in the case as applicants for disability benefits have an incentive to exaggerate their symptoms.") (internal quote marks and alteration omitted).

Plaintiff next argues that neither of the state agency doctors contradict Dr. Sethi's

assessment that her psoriatic arthritis, compounded by anemia and medication side effects, will cause her to need unscheduled breaks. (Pl.'s Br. at 18.) However, the cases plaintiff cites in support of this argument are inapposite. In <u>Moon v. Colvin</u>, 763 F.3d 718, 722-23 (7th Cir. 2014), the court remanded for further proceedings when the ALJ failed to account for absences, an issue the agency physicians did not specifically address. In <u>Flores v. Berryhill</u>, No. 17-C-1438, 2018 U.S. Dist. LEXIS 243416, at *18 (E.D. Wis. Sept. 12, 2018), I awarded benefits, but in that case the agency's own testifying medical expert opined that the claimant would miss more work than employers allow, a finding none of the other medical opinions in the record specifically contradicted; under those "highly unusual" circumstances, I found a judicial award appropriate. <u>Id.</u> This case is unlike <u>Flores</u>. In reply, plaintiff cites <u>Guerra v. Saul</u>, No. 18-C-563, slip op. at 13 (E.D. Wis. Oct. 29, 2019), a case in which I ordered benefits under <u>Kaminski</u>. That case, too, is distinguishable, as the Commissioner had conceded error in the ALJ's evaluation of the treating specialist's report and was unable to cite any substantial evidence contradicting it. <u>Id.</u> at 12-13. In this case, the Commissioner vigorously defends the ALJ's decision and cites a significant amount of evidence that could be seen as contradicting Dr. Sethi's opinions.

Plaintiff next argues that the remaining factors, including Dr. Sethi's speciality and their treatment history, support giving the opinion controlling weight. (Pl.'s Br. at 18.) To receive controlling weight the opinion must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The other factors, including the length, nature and extent of the treatment relationship, and the doctor's specialization, come into play if the opinion is not given controlling weight. <u>Id.</u>; <u>Bauer v. Astrue</u>, 532 F.3d 606, 608 (7th Cir. 2008)

(stating that when a treating physician's opinion is not given controlling weight "the checklist comes into play").

Finally, plaintiff contends that the ALJ's errors break no new ground and defy multiple precedents. (Pl.'s Br. at 19; see also Pl.'s Br. at 16, citing a study suggesting that ALJs are discouraged from taking court precedents into account.) The court may order benefits "only if all factual issues have been resolved and the record supports a finding of disability." Briscoe, 425 F.3d at 356; it may not do so to punish the agency for "obduracy" in applying the law as set down by the court. Id. Plaintiff argues that, if the case is remanded, the record will not contain facts that could establish by a preponderance of the evidence that Dr. Sethi erred in finding that her fatigue, which is a common symptom of her condition and a common side effect of medications she takes, which is further worsened by her anemia, and which is generated by a rheumatological disorder Dr. Sethi is an expert in and for which Dr. Sethi has extensively treated her, will require her to take unscheduled breaks at work. (Pl.'s Br. at 19.) As discussed above, noting that symptoms are commonly associated with a condition is no substitute for specific evidence that the claimant suffers from such symptoms. See Schmidt, 395 F.3d at 746. And, when the ALJ fails to discuss the checklist factors, the usual remedy is to remand for that analysis, rather than to award benefits. See, e.g., Cheryl G. v. Saul, No. 18 C 2604, 2019 U.S. Dist. LEXIS 158163, at *21 (N.D. Ill. Sept. 17, 2019) ("It is the duty of the ALJ, not the Court, to weigh the medical opinion evidence according to the regulatory factors.").

For all of these reasons, I will remand this case for further proceedings.

## C. Dr. Poullette's Opinion

Plaintiff argues that the ALJ also erred in evaluating Dr. Poullette's opinion. (Pl.'s Br. at 20.) As indicated above, the ALJ discounted this opinion because (1) Dr. Poullette did not

24

treat plaintiff for psoriatic arthritis, her primary impairment; (2) he did not cite evidence or support for her alleged need to lie down, nor did his opinion suggest a basis for the off-task and unscheduled break limits; and (3) his proposed limitation in use of the hands and fingers was inconsistent with the clinical findings of tenderness in the hands but no significant synovitis, plaintiff's activities including driving, and the clinical signs of retained strength in the hands and upper extremities.  (Tr. at 19.)

Plaintiff acknowledges that Dr. Poullette's opinion may be worth less because he is not the rheumatologist who treated plaintiff's arthritis.  But the ALJ gave more weight to the agency reviewing physicians, who are also not specialists and did not treat plaintiff for anything; Dr. Poullette, on the other hand, regularly examined her during the relevant period, something the ALJ failed to discuss.  (Pl.'s Br. at 20.)  As plaintiff notes, the Seventh Circuit has found such inconsistency to be grounds for remand.  See Bjornson v. Astrue, 671 F.3d 640, 647-48 (7th Cir. 2012) (reversing where the ALJ's criticisms of an opinion he rejected also applied to the opinion he credited).

Plaintiff's argument that Dr. Poullette did provide evidence and support for his proposed limitations is less persuasive.  (Pl.'s Br. at 20-21.)  Plaintiff notes that the doctor checked "positive objective signs" of joint swelling, tenderness, muscle weakness, and chronic fatigue (Tr. at 460), but it was not unreasonable for the ALJ to look for some explanation as to how those signs supported the need for eight unscheduled breaks Dr. Poullette circled on the next page of the form report.  (Tr. at 461.)  The regulation states: "The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."  20 C.F.R. § 404.1527(c)(3).  Plaintiff also complains that the ALJ failed to state which of Dr. Poullette's limitations was contradicted by her driving (Pl.'s Br. at 21), but he was plainly

referring to the "limitations in the use of hands and fingers." (Tr. at 19.) While the ALJ could have said more about why plaintiff's occasional driving contradicted Dr. Poullette's limitation to using the hands 50% of the day (Pl.'s Br at 21-22; Tr. at 17, 462), this was just one of the inconsistencies the ALJ cited in this portion of his opinion.

Plaintiff gains more traction with her argument about medication side effects, which Dr. Poullette indicated would interfere with attention and concentration. (Pl.'s Br. at 21; Tr. at 460, 476.) Plaintiff averred that she experienced such effects (Tr. at 384), and the ALJ did not specifically discuss the issue. <u>See</u> SSR 16-3p, 2016 SSR LEXIS 4, at *19 (directing the ALJ to consider the type, dosage, and side effects of any medications the claimant takes).

The ALJ will on remand need to take another look at Dr. Poullette's opinion as well.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and this matter is remanded for further proceedings consistent with this decision. The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 27th day of April, 2021.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

## APPENDIX—PERTINENT TREATMENT NOTES

On October 9, 2014, plaintiff saw Dr. Robert Ehrhart, her then-treating rheumatologist, doing quite well on her present regimen. (Tr. at 1159.) On December 31, 2014, Dr. Ehrhart noted her psoriatic arthritis was under good control. (Tr. at 1160.)

On September 9, 2015, plaintiff saw Dr. Poullette, and on exam he noted full range of motion of all four extremities, no joint swelling or tenderness, and normal gait. (Tr. at 522.) In his assessment, he noted psoriatic arthropathy, on Enbrel, followed by rheumatology. (Tr. at 523.)

On October 5, 2015, plaintiff saw Dr. Sethi for follow up of her psoriatic arthritis. Her main problem was inflammation in the sacroiliac ("SI") joints, with flare-ups lasting one to two days every one to two months. (Tr. at 524.) On exam, Dr. Sethi noted no synovitis of the joints, normal range of motion, and mild tenderness of the bilateral SI joints to palpation. (Tr. at 528.) Dr. Sethi assessed psoriatic arthritis, definitely better after use of etanercept (Enbrel). (Tr. at 530.) Plaintiff also had a trigger finger, right first IP joint, for which she was to see orthopedics. (Tr. at 531.)

On November 24, 2015, plaintiff returned to Dr. Sethi, reporting she had been under a lot of stress, which made her psoriatic arthritis more active. She reported back stiffness standing for a long time, but noted no major change in joint swelling. (Tr. at 534.) On exam, Dr. Sethi noted no joint synovitis, normal range of motion, and mild tenderness of the SI joints. (Tr. at 538.) Dr. Sethi assessed psoriatic arthritis, with good response to etanercept, still some flares, better than in the past. (Tr. at 540.) Dr. Sethi noted plaintiff may need to limit her activity, not stand for a longer time, and move around if sitting in one position for a long time. (Tr. at 541.)

On November 25, 2015, plaintiff saw Dr. Poullette, reporting she recently lost her job. "She discussed the possibility of going on disability with her rheumatologist yesterday. Her rheumatologist contacted me and didn't think that she would be a candidate for disability. She wanted my opinion on the subject as well." (Tr. at 541.) Dr. Poullette stated: "She has been working. I think she could continue to work in the right work setting." (Tr. at 544.)

On February 6, 2016 (the amended onset date), plaintiff saw Dr. Sethi, who noted: "Overall, she is doing the same but is going through the flareup. . . . When she is not going through a flareup, she is otherwise doing okay. No increased morning stiffness. When the flareup happens it involves all the joints including the hands. This usually lasts for 1-2 days and resolves on its own." (Tr. at 544.) On exam, Dr. Sethi noted: "Dactylitis present on the right third and left second digit? Mild. Tenderness present on multiple PIP joints. No other joints of upper and lower extremities have synovitis. ROM was normal. Mild tenderness on bilateral sacroiliac joints on palpation." (Tr. at 548.) Dr. Sethi assessed psoriatic arthritis, active today, prescribing methotrexate in combination with etanercept. (Tr. at 549.)

On April 5, 2016, plaintiff saw Dr. Poulette regarding her diabetes. (Tr. at 550, 554.) On review of systems, the doctor noted no pain, swelling, or stiffness. (Tr. at 552.)

On July 1, 2016, plaintiff returned to Dr. Sethi. She had not started the methotrexate. She reported more achiness and pain in her back, more stiffness in the SI joint region, "even the hands get affected. She does think that the medications have made her feel better but there are things that she still struggles with. . . . She has not been able to work lately." (Tr. at 555.) On exam, Dr. Sethi noted: "Very mild dactylitis present on bilateral second and third fingers, no significant synovitis in MCPs and PIPs, wrists bilaterally. No significant synovitis in bilateral elbows or bilateral shoulders. Significant tenderness on palpation of sacroiliac joint

region." She noted normal range of motion of various joints. (Tr. at 559.) Dr. Sethi again suggested a combination of methotrexate and etanercept. (Tr. at 561.)

On October 4, 2016, plaintiff saw Dr. Poullette (Tr. at 561), who noted her psoriatic arthritis was followed by rheumatology. (Tr. at 562). Review of systems revealed low back pain, chronic, related to her arthropathy, but a generally normal physical exam (normal motor function, normal sensory function, no focal deficits). (Tr. at 564-65.)

On October 5, 2016, plaintiff saw Dr. Sethi, stating she was more achy in the lower back, also in the hands and sometimes the right knee. She had not started methotrexate because she had questions. "Because of long-standing arthritis and pain she has not been able to work lately. She is considering applying for disability." (Tr. at 566.) On exam, Dr. Sethi noted "no significant synovitis present in MCPs, PIPs or DIPs but there is tenderness in these areas. No significant synovitis in elbows and shoulders. Tenderness present on bilateral sacroliac joint region[.]" (Tr. at 570.) Plaintiff displayed normal range of motion of the ankles, feet, and hips. (Tr. at 570.) Dr. Sethi again recommended plaintiff try the combination of etanercept and methotrexate together. "Her problems are a combination of psoriatic arthritis, obesity and diabetes." (Tr. at 571.)

On October 16, 2016, plaintiff saw Dr. Poullette for an annual exam. (Tr. at 572.) On review of systems, he noted no back or joint pain, no joint swelling or tenderness, and no muscle pains or spasms. (Tr. at 574.) On exam, plaintiff displayed full range of motion of all four extremities, with no joint swelling or tenderness. (Tr. at 575.)

On February 10, 2017, plaintiff saw Dr. Sethi, who noted "she doesn't have joint swelling today but she has had flareups in between with joint swelling and she has had periods of back ache as well as pain in the hands and the right knee. Some of the pains also get worse with

activity, gets better with rest. This has limited her daily activities." (Tr. at 621.) She had been taking etanercept with methotrexate since the last visit. "She does think that she was definitely worse without the medications however, she doesn't think that she is better completely." (Tr. at 621.) On exam, Dr. Sethi noted "no significant synovitis present in MCPs, PIPs or DIPs but there is tenderness in these areas. No significant synovitis in elbows and shoulders. [B]ilateral SI joints are tender. Normal range of motion of bilateral ankles and feet. No significant effusion in bilateral knees. Bilateral hips have normal range of motion." (Tr. at 625.) Dr. Sethi continued etanercept and methotrexate, noting plaintiff did have other problems, including mechanical back pain, as well as obesity and diabetes. (Tr. at 627.)

On April 4, 2017, plaintiff saw Dr. Michael Barry to establish care, taking over from Dr. Poullette. (Tr. at 627.) Dr. Barry noted type 2 diabetes, without complication. (Tr. at 631.)

On May 7, 2017, plaintiff suffered a small acute stroke. (Tr. at 662-63, 666, 675, 680.) After noticing right-side weakness and slurred speech, she went to the emergency room. By the time she arrived in the ER, she had only some mild right-sided facial weakness and slurred speech; her other weakness had resolved. By the time neurology evaluated her, she had no neurological symptoms. She was given aspirin and Plavix in the ER. (Tr. at 673.) The following day, she reported continued weakness in the right arm, but her speech seemed back to normal. (Tr. at 687.) The consulting neurologist recommended aspirin and Plavix for three months, then switch to aspirin alone. (Tr. at 687.) She discharged in stable condition on May 9, 2017, requiring no further therapy. (Tr. at 696.) On follow-up exam with Dr. Barry on May 19, 2017, she had an essentially normal neurological exam. (Tr. at 724.) By May 24, 2017, plaintiff reported doing well, with speech completely normalized. She still had some difficulties with fine motor skills with the right hand, and her right leg was slightly weak. (Tr. at 764.) At

a July 6, 2017, follow-up with Dr. Barry, plaintiff reported no new neurological symptoms, but with some continued clumsiness of the right hand and mild fatigue.  (Tr. at 783.)

On August 23, 2017, plaintiff saw Dr. Sethi.  She had stopped methotrexate due to side effects.  She had no significant joint swelling at that time but did report chronic back pain, mostly on the left side.  She recently had a stoke, still recovering, with her right side still weak.  (Tr. at 814.)  "The psoriasis is under good control.  She feels she still has pain from the disease but does think the medications have worked well for her."  (Tr. at 814.)  On exam, Dr. Sethi again noted "no significant synovitis present in MCPs, PIPs or DIPs but there is tenderness in these areas.  No significant synovitis in elbows and shoulders.  [B]ilateral SI joints are tender.  Normal range of motion of bilateral ankles and feet.  No significant effusion in bilateral knees.  Bilateral hips have normal range of motion."  (Tr. at 818.)  Neurologically, plaintiff displayed 4/5 muscle strength on the right, 5/5 on the left.  (Tr. at 818.)  Dr. Sethi continued etanercept therapy.  (Tr. at 819.)

On September 5, 2017, plaintiff saw Dr. Barry regarding elevated blood pressure.  He assessed benign essential hypertension.  (Tr. at 821.)

On November 28, 2017, plaintiff saw Dr. Sethi for follow-up.  Since the last visit, she noted some flare-up of the psoriasis, mild and minimal around the navel and left elbow.  "As far as the arthritis is concerned, she does think that the etanercept works for her, however, she continues to have some achiness, usually in the back, after activity.  Nothing has gotten better or worse since last visit."  (Tr. at 1168.)  On exam, Dr. Sethi again noted "no significant synovitis present in MCPs, PIPs or DIPs but there is tenderness in these areas.  No significant synovitis in elbows and shoulders.  [B]ilateral SI joints are tender.  Normal range of motion of bilateral ankles and feet.  No significant effusion in bilateral knees.  Bilateral hips have normal

range of motion." (Tr. at 1172.) Neurologically, she again displayed 4/5 muscle strength on the right, 5/5 on the left. (Tr. at 1172.) Dr. Sethi continued etanercept monotherapy. (Tr. at 1174.)

On April 26, 2018, plaintiff saw Dr. Mohammad Rana, on referral from Dr. Barry, for complaints of chest pain with exertion. (Tr. at 1175.) Significant ischemia was noted on a stress test, so the doctor proceeded with a coronary angiogram (Tr. at 1181), which revealed multi-vessel coronary artery disease (Tr. at 1191). On May 18, 2018, plaintiff saw Dr. David Kress, who recommended surgery. (Tr. at 1287, 1294.) He told her to stop etanercept, holding two weeks post-operatively. (Tr. at 1294.) On May 29, 2018, plaintiff underwent coronary artery bypass graft surgery. (Tr. at 1305, 1328-29.) She discharged on June 6, 2018, with restrictions of no lifting above 10 pounds for six weeks and no driving for two weeks. (Tr. at 1285, 1384.)

On June 25, 2018, plaintiff saw Dr. Sethi, reporting she felt more stiff and achy in several joints, including the back and hips, off etanercept, which had been paused because of the recent bypass surgery. Her psoriasis had not cleared up, she had no obvious swollen joints, and she appeared to be recovering well from the surgery. (Tr. at 1192.) Dr. Sethi noted the same exam findings as at the three previous visits. (Tr. at 1197.) Once cleared from cardiology, plaintiff would continue with etanercept monotherapy. (Tr. at 1202.)

On July 18, 2018, plaintiff followed up with Dr. Rana after her coronary artery bypass graft surgery, recovering gradually. She continued with limited activity levels but was attending cardiac rehabilitation with improvement. (Tr. at 1203.) Dr. Rana noted she was doing well, with no new significant complaints; he advised regular exercise, dietary changes, and weight loss. (Tr. at 1211.)

On September 28, 2018, plaintiff saw Dr. Ali Khan, transferring care from Dr. Rana. She reported not feeling well the previous week, quite tired, sleeping until noon and experiencing shortness of breath with exertion. At that visit, however, she felt much better, denying chest pain and shortness of breath. (Tr. at 1213.) On exam, she displayed normal range of motion and no edema. (Tr. at 1217.) Dr. Khan encouraged non-strenuous exercise, walking 30 minutes per day, working up to 45. (Tr. at 1219.)